McGREGOR W. SCOTT
United States Attorney
ANDRÉ M. ESPINOSA
KEVIN KHASIGIAN
Assistant United States Attorneys
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700

Attorneys for Plaintiff
United States of America

**FILED**

JAN 2 2 2020

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
                    DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 2:20-cr-0018 TLN |
| Plaintiff, | 18 U.S.C. § 371 – Conspiracy To Commit An Offense Against The United States; 18 U.S.C. § 1957(a) – Money Laundering |
| v. | |
| PAULETTE CARPOFF, | |
| Defendant. | |

I N F O R M A T I O N

COUNT ONE: [18 U.S.C. § 371 – Conspiracy to Commit an Offense Against the United States]

The United States Attorney charges: T H A T

PAULETTE CARPOFF,

defendant herein,

## I.    **INTRODUCTION**

At all times relevant to this Indictment:

1.      DC Solar Solutions, Inc., formerly DC Solar Manufacturing, (hereinafter "DC Solar Solutions"), headquartered in Benicia, California, in the State and Eastern District of California, was a solar energy device manufacturing and sales corporation that primarily solicited investors to participate in transactions organized around the manufacture and deployment in the market of mobile solar generator units.

INFORMATION

1

2.     DC Solar Distribution, Inc. (hereinafter "DC Solar Distribution"), headquartered in Benicia, California, in the State and Eastern District of California, was a separate corporation but closely related to DC Solar Solutions, and primarily responsible for managing certain equipment sold in transactions closed by DC Solar Solutions.

3.     Although they were separate legal entities, which carried separate accounting and tax obligations, DC Solar Solutions and DC Solar Distribution shared common employees and facilities, relied on common leadership, and operated in material respects as a single entity (collectively "DC Solar").

4.     Co-conspirator Jeff Carpoff, charged elsewhere, was a resident of Martinez, California, the owner and operator of DC Solar Solutions, and the Chief Executive Officer of DC Solar.

5.     Defendant PAULETTE CARPOFF was a resident of Martinez, California, the owner and operator of DC Solar Distribution, and the Chief Operations Officer of DC Solar.

6.     Individual 3, not charged herein, was a resident of Lafayette, California, and an attorney licensed to practice law in California. Individual 3 was outside counsel to DC Solar, and provided legal and business advice concerning DC Solar's operations. Individual 3 began working with DC Solar in approximately April 2011.

7.     Co-conspirator Robert A. Karmann, charged elsewhere, was a resident of Clayton, California, and the Chief Financial Officer for DC Solar. Co-conspirator Robert A. Karmann began working for DC Solar in approximately August 2014.

8.     Co-conspirator Ryan Guidry, charged elsewhere, was a resident of Pleasant Hill, California, and the Vice President of Operations for DC Solar. Co-conspirator Ryan Guidry began working for DC Solar in approximately May 2012.

9.     Co-conspirator Alan Hansen, charged elsewhere, was a resident of Vacaville, California, and a former employee of a national telecommunications company ("Telecom Company A"). In that role, co-conspirator Alan Hansen developed a business relationship with co-conspirator Jeff Carpoff and DC Solar in or about 2013. In or about November 2015, co-conspirator Alan Hansen accepted employment at DC Solar, where he worked until approximately February 2018.

10.     Co-conspirator Ronald J. Roach, charged elsewhere, was a resident of Walnut Creek,

California, and a certified public accountant licensed in California. Co-conspirator Ronald J. Roach maintained an accounting practice between 2003 and 2018 and began performing significant work for DC Solar as early as the end of 2011. Among other things, co-conspirator Ronald J. Roach prepared complied annual financial statements for DC Solar Distribution for 2011 through 2017.

11.   Co-conspirator Joseph W. Bayliss, charged elsewhere, was a resident of Martinez, California, a general contractor and electrician licensed in California, and the owner and operator of Bayliss Innovative Services, Inc., a contracting services company. Co-conspirator Joseph W. Bayliss began performing work for DC Solar in late 2013.

## II.     THE CONSPIRACY

12.   Beginning at a time no later than in or about March 2011, and continuing through in or about January 1, 2019, in the State and Eastern District of California and elsewhere, defendant PAULETTE CARPOFF did knowingly and intentionally combine, agree, and conspire with Jeff Carpoff, Bayliss, Roach, Karmann, Guidry, Hansen, Individual 3, and others known and unknown to the United States, to commit an offense against the United States, that is, wire fraud in violation of Title 18, United States Code, Section 1343.

## III.     THE OBJECT OF THE CONSPIRACY

13.   The object of the conspiracy was to execute or attempt to devise, participate in, and execute a material scheme to defraud investors and to obtain money and property by means of materially false and fraudulent pretenses, representations, promises, and omissions, and the concealment of material facts, in violation of Title 18, United States Code, Section 1343.

## IV.     MANNER AND MEANS

14.   In furtherance of the conspiracy, defendant PAULETTE CARPOFF and her co-conspirators employed the following ways and means, among others:

15.   Directly and through subcontractors, DC Solar Solutions built and purported to build mobile solar generators ("MSGs"). The MSGs, when actually built, consisted primarily of solar panels placed on a wheeled-trailer that harvested and stored solar energy for later use by customers including at such locations as concert venues, and construction sites, in remote areas and elsewhere.

16.     DC Solar Solutions, including through the efforts of defendant PAULETTE CARPOFF, her co-conspirators, and others acting at their direction, sold MSGs in multi-unit packages to investors through special purpose investor funds created specifically for such transactions.  These investment funds, sometimes called tax-equity funds ("Funds"), were permitted under the federal tax code and purchased the MSGs with a combination of a cash payment and a long-term promissory note payable to DC Solar Solutions.

17.     As part of the transactions, DC Solar Distribution leased those MSGs from the Funds and purported to sub-lease the MSGs to third parties to generate revenue.  In fact, the conspirators were often unable to sub-lease the MSGs to third parties, contrary to representations of the conspirators and others acting at their directions that the rental market for MSGs was robust.

18.     To encourage investors to purchase MSGs from DC Solar and to avoid detection of the scheme as it progressed, defendant PAULETTE CARPOFF, her co-conspirators, and others acting at their direction made material representations to investors, through oral statements and written materials, including that (1) the MSGs would be built and/or existed in quantities and conditions of operability consistent with the representations of the conspirators; (2) DC Solar Distribution had sub-leased and could sub-lease the MSGs to third parties pursuant to written lease agreements; (3) there was a substantial market for the MSG sub-leases; and (4) the transactions involving the MSGs and the Funds were structured in such a way that would allow the investors to lawfully claim tax credits and other tax benefits related to the MSGs.

19.     In fact, those statements were materially false in that (1) the MSGs were not built in the quantities represented and did not exist in the quantities and the conditions of operability represented; (2) DC Solar Distribution had not sub-leased and could not sub-lease the MSGs in the quantities or on the terms represented; (3) the market for MSG sub-leases was significantly less than represented; and (4) the transactions were not executed in a such a way that they could lawfully qualify for tax credits and other tax benefits, in part, because the MSGs that formed the basis of the transactions often did not exist and/or were not being used consistent with the representations made by the conspirators.

20.     To support the false claims made to investors and to avoid detection of the scheme, the conspirators took steps including materially falsifying Commissioning Reports and other records related

to the MSGs and replacing Vehicle Identification Numbers ("VIN") on MSGs to make it appear that more MSGs had been built than had actually been constructed. In some instances, the conspirators sold and/or attempted to sell the same MSGs to more than one Fund, switching the VIN numbers on existing MSGs to defeat investor inspections.

21.     To further conceal the ongoing scheme and to encourage additional investments, defendant PAULETTE CARPOFF, her co-conspirators, and others acting at their direction, also created the appearance of revenue from MSG sub-leases by operating a Ponzi-type scheme. Conspirators transferred investor money through the DC Solar entities they controlled to create the appearance that DC Solar Distribution was collecting substantial amounts of third-party sub-lease revenue from the MSGs that DC Solar Distribution was then using to pay the Funds, which the Funds, in turn, paid DC Solar Solutions to service the Funds' promissory notes. In reality, approximately 94% or more of DC Solar Distribution's purported MSG sub-lease revenue came from money stolen from investors.

22.     To further the ongoing fraud and to avoid detection of the scheme, defendant PAULETTE CARPOFF and her co-conspirators agreed to conceal the true financial structure of DC Solar and the true nature and extent of third-party MSG sub-leases from current and prospective investors through materially false representations and supporting documents. Among other means, the conspirators agreed to prepare and disseminate false compiled annual financial statements, which falsely represented that DC Solar Distribution had earned revenue in sufficient amounts to support its obligations under its master leases with the Funds. The conspirators completed those false financial statements knowing they would be shared with investors and intending investors to rely on the false misrepresentations they contained.

23.     Between at least as early as March 2011 and December 18, 2019, at least twelve investors entered into transactions with DC Solar through approximately thirty-four Funds. Some investors invested through more than one Fund. The investors, through the Funds, collectively deposited by interstate wire transfer approximately $759,400,000 into bank accounts for the Funds established for the transactions. Further, several financial institutions and other investors transferred collectively $152,700,000 to DC Solar as part of related transactions for the purchase and lease of MSGs. In total, DC Solar closed transactions with Funds and others that contributed an aggregate of more than

$912,000,000 to purchase MSGs. Those transactions purportedly involved approximately 17,000 MSGs, at approximately $2.5 billion in purported value.

24.     Defendant PAULETTE CARPOFF and co-conspirators Jeff Carpoff took the money investors paid into the DC Solar MSG transactions, and used that money to hide DC Solar's failure to earn revenue from third-party MSG sub-leases and to prop up DC Solar by cycling new investor money to support its obligations to existing and older investors.

25.     It was also part of the scheme that, to present the appearance they operated a successful and legitimate business to continue to attract and lull investors, defendant PAULETTE CARPOFF and co-conspirator Jeff Carpoff used investor money to support a lavish lifestyle, which included payment for more than 150 luxury and collector vehicles, luxury real estate in Lake Tahoe, Las Vegas, the Caribbean, Cabo San Lucas, Mexico, and elsewhere, a suite at a professional football stadium, a private jet service, gambling, jewelry, and other personal property.

26.     It was further part of the scheme that, to advertise their fraudulent venture and create the appearance they operated a successful and legitimate business to continue to attract and lull investors, defendant PAULETTE CARPOFF and co-conspirator Jeff Carpoff also used investor money to support payment for a minor-league professional baseball team, a NASCAR racecar sponsorship, a 2018 performance by an internationally known recording artist at a DC Solar holiday party, as well as bonus payments to employees and others, and illicit payments to co-conspirators and others.

27.     It was part of the scheme that, based on the conspirators' material misrepresentations and other acts in furtherance of their scheme, investors would pursue, through the Funds, tax benefits from the Internal Revenue Service to which they were not entitled because of the false nature of the claimed revenue supporting the transactions. Many investors pursued those tax benefits, and claimed tax credits and depreciation in connection with the transactions premised on the revenue allegedly generated by DC Solar Distribution. The tax value of the tax credits and depreciation claimed by the Funds, up to and including the 2017 tax year, is approximately $902,000,000. This figure does not account for approximately $167,000,000 in additional money that investors paid into tax equity transactions in 2018.
///

## V.   **OVERT ACTS**

In furtherance of the conspiracy and to effectuate the objects and purposes of the conspiracy, the following overt acts, in addition to others, were committed in the State and Eastern District of California and elsewhere:

28.     As early as September 2011, the conspirators began making and directing intercompany transfers between DC Solar Solutions and Distribution to pay obligations to the Funds arising in April 2011, only one month after the close of the first tax equity transaction.

29.     In or about June 2012, co-conspirators Jeff Carpoff, Ronald J. Roach, Individual 3, and others met to discuss DC Solar Distributions' failure to generate third-party lease revenue sufficient to meet its financial obligations to the Funds.  The conspirators agreed to conceal that failure from current and prospective investors, by, among other means, making periodic transfers of investor money paid to DC Solar Solutions into DC Solar Distribution's account, and misrepresenting it as third-party lease revenue earned by DC Solar Distribution.

30.     In September 2013, co-conspirator Ronald J. Roach prepared false financial statements for DC Solar Distribution, for 2011 and 2012, which mischaracterized transfers from DC Solar Solutions as revenue DC Solar Distribution earned.

31.     On or about April 21, 2015, co-conspirator Ronald J. Roach prepared a compiled 2014 financial statement for DC Solar Distribution, which falsely represented that DC Solar Distribution earned more than approximately $14,234,000 in rental income.

32.     In or about September 2015, co-conspirator Jeff Carpoff offered to pay co-conspirator Ryan Guidry $1,000,000 to obtain a signature on a purported lease agreement between Telecom Company A and DC Solar Distributions.  Co-conspirator Jeff Carpoff also offered to pay whoever signed the lease agreement $1,000,000.

33.     On or about July 21, 2015, defendant PAULETTE CARPOFF authorized and caused payments from DC Solar Solutions to KMHS, a third-party equipment rental company that purported to be leasing MSGs sold to the investors in Fund 9.

34.     On or about September 11, 2015, co-conspirator Alan Hansen signed the purported lease agreement between Telecom Company A and DC Solar Distribution (the "September 11, 2015 Lease").

35.     On or about November 2, 2015, defendant PAULETTE CARPOFF authorized and caused payments from DC Solar Solutions to KMHS, a third-party equipment rental company that purported to be leasing MSGs sold to the investors in Fund 9.

36.     On or about November 18, 2015, co-conspirator Robert A. Karmann delivered by email compiled financial statements for DC Solar Distribution to a representative of the investor in Fund 6 and Fund 12, which falsely represented the amount of third-party lease revenue DC Solar Distribution earned during 2014.

37.     On or about February 23, 2016, co-conspirator Robert A. Karmann delivered by email written operation reports to a representative of the investor in Fund 12, which falsely represented that MSGs sold to Fund 12 were leased to a third-party entity and earning income from that third-party entity during the second, third, and fourth quarters of 2015.

38.     On or about February 25, 2016, co-conspirator Robert A. Karmann delivered by email written operation reports and summaries of mobile facilities to a representative of the investor in Fund 6, which falsely represented that MSGs sold to Fund 6 were leased to a third-party entity and earning income from that third-party entity during the second, third, and fourth quarters of 2015.

39.     On or about May 3, 2016, co-conspirator Ronald J. Roach prepared a compiled 2015 financial statement for DC Solar Distribution, which falsely represented that DC Solar Distribution earned more than approximately $29,845,000 in rental income.

40.     On or about May 12, 2016, co-conspirator Robert A. Karmann delivered by email to a representative of the investor in Fund 6 and Fund 12, a written summary, which falsely represented that MSGs sold to Fund 6 and Fund 12, and leased to third-party entities, earned sufficient leases revenue in 2015 to support payment of a profit to investors in Fund 6 and Fund 12.

41.     On or about May 13, 2016, co-conspirator Robert A. Karmann delivered by email a written operation report and summary of mobile facilities to a representative of the investor in Fund 6, which falsely represented that MSGs sold to Fund 6 were leased to a third-party entity and earning income from that third-party entity during the first quarter of 2016.  In the same email, co-conspirator Robert A. Karmann also delivered a written operation report to a representative of the investor in Fund 12, which falsely represented that MSGs sold to Fund 12 were leased to a third-party entity and earning

1  income from that third-party entity during the first quarter of 2016.

2      42.     On or about May 10, 2017, co-conspirator Ronald J. Roach prepared a compiled 2016

3  financial statement for DC Solar Distribution, which falsely represented that DC Solar Distribution

4  earned more than approximately $58,390,000 in rental income.

5      43.     In or about July 2017, co-conspirator Jeff Carpoff offered to pay co-conspirator Ronald J.

6  Roach and Individual 3 each $500,000 to help deceive the investors in the A Group/K Bank flip deal, in

7  relation to their purchase of MSGs from Fund and Fund 3.

8      44.     On or about July 18, 2017, co-conspirator Ronald J. Roach, acting at the direction of co-

9  conspirator Jeff Carpoff, delivered by email documents to representatives of the investors in the A

10  Group/K Bank flip deal, to which were attached financial statements for DC Solar Distribution for 2014

11  through 2016, and an aging report that purported to set forth payment history for MSG rentals by

12  Telecom Company A pursuant to the 2015 Telecom Company A Lease.

13      45.     In or about June 2017, co-conspirator Jeff Carpoff offered to pay co-conspirator Ryan

14  Guidry $20,000 to obtain a signature on a certificate purporting to assign the investors in the A Group/K

15  Bank flip deal the right to receive purported revenue for MSG rentals by Telecom Company A, pursuant

16  to the September 11, 2015 Lease (the "2017 Certificate").

17      46.     In or about July 2017, co-conspirators Ryan Guidry and Alan Hansen forged a signature

18  approximating the name of a former Telecom Company A employee on that 2017 Certificate, for which

19  co-conspirator Jeff Carpoff paid them $20,000.

20      47.     On or about July 21, 2017, co-conspirator Ryan Guidry delivered by email to co-

21  conspirator Jeff Carpoff the 2017 Certificate with the forged signature, which co-conspirator Jeff

22  Carpoff caused to be delivered to a representative of the investors in the A Group/K Bank flip deal.

23      48.     On or about June 27, 2017, at the direction of co-conspirator Jeff Carpoff, co-conspirator

24  Joseph W. Bayliss, completed and signed Commissioning Reports for MSGs associated with Fund 30,

25  which involved approximately 1,326 MSGs.

26      49.     On occasions in 2017 and 2018, in Benicia and Las Vegas, co-conspirator Jeff Carpoff

27  worked with co-conspirators Ryan Guidry, Joseph W. Bayliss, and others to scrape off VIN number

28  stickers from MSGs assigned to particular transactions and replace them with VIN number stickers

1  assigned to different transactions, in advance of investor inspections of those MSGs.

2         50.     In or about April 2018, at the direction of co-conspirator Jeff Carpoff, co-conspirator

3  Ryan Guidry coordinated the deployment of MSGs to sites where MSGs associated with the A Group/ K

4  Bank flip deal were purportedly in use, before and on the day of inspections associated with that

5  transaction.

6         51.     On June 28, 2018, co-conspirator Robert A. Karmann delivered by email compiled

7  financial statements for DC Solar Distribution  to a representative the investor in Fund 32, which falsely

8  represented the amount of third-party lease revenue DC Solar Distribution earned during 2017.

9         All in violation of Title 18, United States Code, Section 371.

10  COUNT TWO: [18 U.S.C. § 1957(a) – Money Laundering]

11         The United States Attorney charges: T H A T

12                          PAULETTE CARPOFF,

13         52.     Paragraphs 1 through 11 and 13 through 51 of Count One of this Information are re-

14  alleged and incorporated by reference as if fully set forth herein.

15         53.     On or about November 21, 2018, in the State and Eastern District of California and

16  elsewhere, defendant PAULETTE CARPOFF knowingly and intentionally engaged in and attempted to

17  engage in a monetary transaction affecting interstate commerce in criminally derived property of a value

18  greater than $10,000, that is, a $350,000 domestic wire transfer of funds drawn on an account at CTB

19  Bank, with an account number ending in 1916 and deposited in a bank account controlled by WME

20  Entertainment, such property having been derived from a specified unlawful activity, that is, a scheme to

21  defraud in violation of Title 18, United States Code, Section 1343, all in violation of Title 18, United

22  States Code, Sections 2 and 1957(a).

23

24   Dated:                                McGREGOR W. SCOTT
                                           United States Attorney
                                                                    Michael D. Anderson
25                                                                  Chief, White Collar Crime
                                     By: _____    for:
26                                       ANDRÉ M. ESPINOSA
                                         Assistant United States Attorney
27

28

INFORMATION                              10

<u>United States v. PAULETTE CARPOFF</u>
**Penalties for Information**

<u>**Defendants**</u>
**PAULETTE CARPOFF**


**<u>COUNT 1:</u>**         **PAULETTE CARPOFF**

VIOLATION:         18 U.S.C. §371 - Conspiracy to Commit an Offense Against The United
States

PENALTIES:         Maximum sentence 5 years in prison; or
Fine of up to $250,000; or both fine and imprisonment
Supervised release of 3 years

SPECIAL ASSESSMENT: $100 (mandatory on each count)


**<u>COUNT 2:</u>**         **PAULETTE CARPOFF**

VIOLATION:         18 U.S.C. § 1957(a) – Money Laundering

PENALTIES:         Maximum of 10 years in prison; or
Fine of $250,000 or twice the value of the property involved in the
transaction; or both fine and imprisonment
Supervised release of 3 years

SPECIAL ASSESSMENT: $100 (mandatory on each count)