PHILLIP A. TALBERT
United States Attorney
CHRISTOPHER S. HALES
KEVIN C. KHASIGIAN
Assistant United States Attorneys
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700
Facsimile: (916) 554-2900

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | CASE NO. 2:20-CR-018-JAM |
|---|---|
| Plaintiff, | GOVERNMENT'S SENTENCING MEMORANDUM |
| v. | |
| PAULETTE CARPOFF, | DATE: June 28, 2022<br>TIME: 9:30 a.m.<br>COURT: Hon. John A. Mendez |
| Defendant. | |

## I. INTRODUCTION

Paulette Carpoff helped orchestrate a massive criminal fraud at the expense of investors and the American taxpayer. As Chief Operating Officer of DC Solar and the owner and operator of its so-called distribution arm, Carpoff played a key role in the fraud by controlling the Ponzi-like payments that hid the company's lack of third-party lease revenue, causing fake engineering reports for MSGs that the company sold but never built, and helping conceal the fraud from the outside world that thought DC Solar was a success.

As the Court has seen previously, while carrying out the fraud Carpoff and her husband enjoyed a gluttonous accumulation of wealth. This included luxury real estate in Lake Tahoe, Las Vegas, the Caribbean, and Cabo San Lucas, over 150 luxury and collector vehicles, a private subscription jet service, lavish jewelry, and massive amounts of cash stashed throughout their home, office, and cars. The nature and circumstances of Carpoff's crimes deserve a substantial sentence. As a result, the

government urges the Court to impose a 15-year sentence, subject to any additional motion the government may make.

## II. SENTENCING RECOMMENDATION

The United States agrees with the sentencing calculations in the final PSR and has no formal objections. ECF 44. Carpoff pleaded guilty pursuant to a plea agreement to two counts of an Information charging her with Conspiracy to Commit an Offense Against the United States in violation of 18 U.S.C. § 371 (Count One) and Money Laundering in violation of 18 U.S.C. § 1957(a) (Count Two). ECF 1, 10, 11. With a total offense level of 43 and a Criminal History Category I, Carpoff's advisory sentencing guidelines range is life. USSG Ch.5, Pt.A. Given the statutory maximums applicable to her counts of conviction, Carpoff's effective Guidelines range is therefore 180 months. PSR 24; USSG §§ 5G1.1(a); 5G1.2(b), (d). For the reasons set forth below, the government recommends that the defendant be sentenced to 180 months in prison subject to any additional motion the government may make, followed by a three-year term of supervised release, payment of restitution in the amount of $661,043,035.06 as specified in the PSR, and a special assessment of $200.

The sentencing factors in 18 U.S.C. § 3553(a) direct the Court to consider, among other things, the nature and circumstances of the offense, the need for the sentence imposed to reflect the seriousness of the offense and provide just punishment, the need to afford adequate deterrence to criminal conduct, and the need to protect the public from further crimes of the defendant and promote respect for the law. 18 U.S.C. § 3553(a)(1) and (a)(2)(A), (B) & (C). Here all of these factors support the sentence recommended by the government, which would be a below-Guidelines sentence absent the applicable statutory maximums that decrease Carpoff's range.

### A. Carpoff controlled the Ponzi-like transfers that concealed DC Solar's circular payment structure and lack of lease revenue.

At the heart of this fraud scheme was a lie about the demand for DC Solar's products and the amount of revenue it could generate from leasing MSGs to third parties. ECF 10 at 21-22, 24. Contrary to what investors were told, approximately 94% of the revenue claimed by DC Solar Distribution from supposed third-party leasing actually came instead from transfers of new investor cash from DC Solar Solutions. ECF 10 at 24. Carpoff, as the owner and operator of DC Solar Distribution, was uniquely

situated to make these intercompany transfers of funds and to direct others such as CFO Robert Karmann to make those transfers, all while purporting instead to lease DC Solar's MSGs to third parties. ECF 10 at 20-22. By ensuring that these intercompany transfers occurred to cover investors' periodic debt obligations to DC Solar, Carpoff helped cover up the fraud scheme and lull investors into believing the third-party leasing was actually taking place. This is one on the first points at which the fraud scheme should have stopped, and that an honest owner and operator of DC Solar Distribution would not have allowed the Ponzi-like scheme to continue.

Carpoff should either not have approved the intercompany transfers of funds, or else should have ensured that investors were not lulled into thinking the millions coming into DC Solar Distribution from those transfers represented a successful third-party leasing business. At least then current and potential investors could have based their decisions on the truth, which was that DC Solar at best had a market for a tiny fraction of its MSGs with little prospect for meaningful lease revenue. Instead Carpoff chose the other path that made her rich.

### B. Carpoff managed specific transfers to supposed third-party lessees to create the appearance of legitimate lease agreements.

In addition to approving and directing the intercompany transfers discussed above, Carpoff also directed payments to supposed third-party lessees from DC Solar Solutions with the knowledge that those payments would simply be turned around and sent back to DC Solar Solutions as supposed lease revenue. ECF 10 at 25. For example, Carpoff knew there no legitimate lease with KMHS, but authorized payments to that company so that KMHS could send it back as purported lease revenue. ECF 10 at 25. Carpoff knew the purpose of doing this was to support the Fund 9 tax equity transaction using false pretenses about this third-party leasing. ECF 10 at 25. In a similar vein, Carpoff worked with her husband to falsely represent the leasing of 416 MSGs to Telecom Company A in order to close a "flip" transaction with A Group and K Bank for over $30 million. ECF 10 at 23:22-24:15.

Just as with the intercompany transfers, an honest person operating in Carpoff's position would not have chosen to fake this third-party lease revenue and would have confronted the business consequences of that decision, including possibly not being able to close Fund 9, the flip deal, or acquire more investor funds. Carpoff again chose the fraudulent, more lucrative path.

GOVERNMENT'S SENTENCING MEMORANDUM   3

### C. Carpoff and her husband caused false Commissioning Reports to issue for MSGs that DC Solar sold but never built.

As DC Solar hemorrhaged money due to its lack of revenue, it simply stopped building the mobile-solar generators that it claimed to be selling to investors. ECF 10 at 22:18-23:6; 26:4-19. Carpoff joined this aspect of the scheme as well when she, working with her husband, caused Joseph Bayliss to make and deliver false Commissioning Reports that falsely certified the existence of MSGs that DC Solar had never built. PSR ¶ 19; ECF 10 at 20:10-11; 23:1-3. The implications of this part of the scheme were clear. Carpoff was present when Bayliss and her husband discussed an exit strategy from this predicament by trying to buy back thousands of non-existent MSGs and selling the parts in false "paper" transactions. ECF 10 at 26:15-19. Obviously Carpoff and her conspirators had the option to decline massive sums of investor money for solar products that didn't exist, but they chose the money.

### D. Carpoff lived a lavish lifestyle with the proceeds of her fraud.

As hundreds of millions in investor money poured into DC Solar because of the fraud, Carpoff's financial empire with her husband exploded. Among other things, they formed six LLCs to purchase various properties, bought over 150 luxury and collector vehicles, bought a suite at the Las Vegas Raiders professional football stadium, invested in a minor-league baseball team, and had a subscription with a private jet service. PSR ¶¶ 20-21. They bought 25 properties including luxury real estate in Lake Tahoe, Las Vegas, the Caribbean, and Cabo San Lucas, and bought expensive jewelry including items such as Cartier watches and a 4.52 carat diamond necklace. PSR ¶ 21. They also lived their lives stuffed to the brim with cash. When search warrants were executed in this case in December 2018, law enforcement found over $18,000 in Carpoff's purse, another over $18,000 in the master bedroom, over $22,000 in a safe in the master bedroom closet, and over $9,000 in cash in the Carpoffs' vehicles parked at their residence. PSR ¶ 22.[1] Again, these are the purchases and behavior of a person enjoying the spoils of fraud in luxury while knowing that she helped build it on lies. These circumstances of the offense weigh heavily against any below Guidelines sentence.

---

[1] This was all in addition to the approximately $1.7 million cash found in the safe in her husband's's office. PSR ¶ 22.

### III. CONCLUSION

For the reasons stated above, in the plea agreement, and in the PSR, the government recommends that the Court sentence the defendant Paulette Carpoff to 15 years in custody, subject to any additional motion the government may make, a three-year term of supervised release, total restitution in the amount $661,043,035.06 as specified in the PSR, and a special assessment of $200.

Carpoff's restitution obligation should be imposed joint and several in its entirety with Jeff Carpoff, Joseph Bayliss, Robert Karmann, and Alan Hansen, who have already been sentenced in the cases numbered 2:20-CR-017 JAM, 2:19-CR-182 JAM, 2:19-CR-222 JAM, and 2:20-CR-016 JAM, respectively.

Respectfully submitted,

Dated: June 21, 2022

PHILLIP A. TALBERT
United States Attorney

By: /s/ CHRISTOPHER S. HALES
CHRISTOPHER S. HALES
Assistant United States Attorney